IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

MARYBETH LAUDERDALE,            )
                                )
        Plaintiff,              )
                                )
        v.                      )        NO. 13-3062
                                )
ILLINOIS DEPARTMENT OF          )
HUMAN SERVICES, MICHELLE        )
SADDLER, sued in her individual )
capacity, ROBERT KILBURY, sued in )
his individual capacity, FRANCISCO )
ALVERADO, sued in his individual )
capacity, and PATRICK J. QUINN,  )
III, sued in his individual capacity, )
                                )
        Defendants.             )

OPINION

RICHARD MILLS, U.S. District Judge:

In her Amended Complaint, Plaintiff Marybeth Lauderdale asserts

that Defendant Illinois Department of Human Services (DHS) violated her

rights pursuant to the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).

The Plaintiff has also filed claims asserting that DHS and the

individual Defendants violated her rights pursuant to 42 U.S.C. § 1983 and

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, by

discriminating against her based on her gender.

At the end of the day, Lauderdale cannot prevail on either theory.

## I. FACTS

### A. Background

Plaintiff Marybeth Lauderdale worked for DHS at the Illinois School for the Deaf (ISD) from October 1990 until July of 2012.  In 2006, the Plaintiff became Acting Superintendent of the School for the Deaf and began earning an annual salary of $77,388.  On September 1, 2010, the Plaintiff became the Interim Dual Superintendent for the School for the Visually Impaired (ISVI) and ISD.  In March 2011, the Plaintiff became the Permanent Dual Superintendent for the ISVI and the ISD.  As both the Dual Superintendent and Permanent Dual Superintendent, the Plaintiff received an annual total salary in excess of $106,000.  The Plaintiff claims that 5% of her salary was for bilingual (sign language) pay.

Reggie Clinton was the superintendent of the ISVI in 2002 and 2003.  According to an exhibit which purports to show his salary history, Clinton's annual salary in July 2003 at the time he left his employment was $93,336.

In 2003, Clinton accepted a job as superintendent of Arcola District Schools where he earned an annual salary of $118,794. Clinton returned to ISVI as Superintendent from January 2008 to June 2010 and earned an annual salary of $121,116.00.

B. Facts pertaining to pay plan

The Illinois Personnel Code, at 20 ILCS 415/8a, directs Central Management Services (CMS) to promulgate administrative rules to govern compensation of positions in state service. Pursuant to Section 8a of the Illinois Personnel Code, CMS promulgated the Pay Plan. The CMS Transactions manual is a guide that state agencies use in order to properly implement the CMS Pay Plan.

The Defendants allege that pursuant to the CMS Pay Plan, CMS sets a specific salary range for a particular position and no one in DHS has input on salary range. The Plaintiff disputes the allegation and states that DHS personnel–specifically Sherrie Bridges and Defendant Francisco Alvarado--were involved in getting the position set up with CMS. Moreover, DHS decided to set up the position as a Senior Public Service

Administrator, which determined the salary range.

The Defendants next assert that pursuant to the CMS Pay Plan and the Transaction Manual, an employee's salary is set by considering the salary range of the position and the individual's most recent salary. The Plaintiff disputes this on the basis that Defendants rely on Illinois Administrative Code Section 310.460, which applies to promotions. The Plaintiff contends she was not given a promotion. Rather, she was hired into a newly created position and given additional duties. Moreover, the Plaintiff further contends that a salary increase can be made for basically any reason determined by the agency decision makers.

The Defendants allege that, pursuant to the CMS Pay Plan and the Transaction Manual, a new employee or a former state employee who is reinstated will not receive more than 5% of their most recent salary, unless a higher percentage is needed to bring the individual's salary to the bottom of the salary range for that position. The Plaintiff disputes the allegation and claims that the Pay Plan allows for a special salary increase above 5% for basically any reason determined by the agency decision makers and they

4

are not limited to the bottom of the salary range.

Pursuant to the CMS Pay Plan, an employee cannot be paid more than the top number of the salary range set by CMS.  If an agency wishes to give an employee more than a 5% salary increase, multiple steps must be taken including, in some instances, a decision memo and a special salary request form referred to as the CMS 183.

C. Dual superintendent position

To create a new position at a state agency, a CMS 104 form must be completed.  This form includes a job description and a salary range.

The Plaintiff was the first and only person to hold the position of Dual Superintendent.  The Plaintiff was offered 5% more than her previous salary to take the Dual Superintendent position.  The Plaintiff notes that this was actually a counteroffer to her request for a $130,000 yearly salary, plus additional benefits and personnel re-allocations to assist her.  The Plaintiff declined the Defendants' counteroffer by making a counteroffer, requesting a yearly salary of $115,000 and an additional 5% with her bilingual pay, which the Plaintiff states would have resulted in a total of

$120,750.

At some point, Defendant Saddler received approval from the Governor's Office and Governor's Office of Management and Budget to offer the Plaintiff a salary above 5% over her most recent salary. In response to the Plaintiff's counteroffer, on July 30, 2010, Defendant Alvarado offered the Plaintiff a salary of $100,000, plus the additional 5%. The Plaintiff made another counteroffer of $112,350, which would have been a 27.5% increase. She further asserts that the Defendants had already refused to pay her an equal amount to Reggie Clinton.

On July 30, 2010, Alvarado sent an email to Saddler and others at DHS noting the Plaintiff's most recent counteroffer and inquiring as to how to proceed. The same day, Saddler sent an email to the Governor's Chief of Staff, Jerome Sterner; the Governor's Deputy Chief of Staff, Toni Irving; and the Director of the Governor's Office of Management and Budget, David Vaught. The email stated:

> Please advise on Marybeth's request below for a 27.5% salary increase. I am concerned that in the current climate, even 19% is pushing the limits of public acceptability – even though we are asking her to assume two full-time superintendent positions.

6

> We have posted the position and may need to say that her salary needs are simply above what can be approved. We may need to hire someone else, and hence we may need to reach out to our various Jacksonville partners.
>
> Please let me know if you disagree.
>
> Thank you Jerry,
> Michelle

Doc. No. 58-14 (Exh. L). The Plaintiff reiterates that the decision to offer her less than Clinton had already been made. Irving responded by saying Saddler should start interviewing replacements.

The Plaintiff accepted a salary of $106,500, which was a 21% increase over her salary as Superintendent of ISD. The Defendants submitted a special salary request form, called a CMS 163, to CMS in order to give the Plaintiff a raise of over 5% from her most recent salary.

Defendant Saddler testified she was not aware of any other employee during her tenure at DHS receiving as high an increase as 21% over a previous salary. In response, the Plaintiff states no one had ever been asked to assume all of the duties of the superintendent of one of the schools and remain the superintendent of the other one. The Plaintiff's salary as dual

superintendent was higher than that of her two immediate supervisors, Defendant Alvarado, Assistant Director of the Division of Rehabilitative Services and Defendant Kilbury, Director of the Division of Rehabilitative Services.  In response, the Plaintiff claims that the positions held by those individuals were not similar in terms of skill, effort, responsibilities and working conditions to the Plaintiff's position.  Neither individual was superintendent of a residential school or two residential schools.

The Plaintiff testified she did not know of any men except Clinton who were paid a higher salary than she was at DHS.  The Plaintiff states that Clinton was the only similarly situated man and he was paid more than she was for doing half her job.

The Plaintiff testified that she understood the State of Illinois was experiencing a major budget crisis between 2010 and 2012.  The budget crisis was purportedly the reason that positions were cut at ISD. Defendants Alvarado and Saddler testified that, at the time the Plaintiff was negotiating her salary, they believed DHS might have to make cuts of 6% across the board and possibly close ISD and ISVI.  The Plaintiff

contends that closing the schools was not a realistic possibility.  Moreover, the State budgeted the position at a level at which she could have been paid a salary comparable to Reggie Clinton.

The Plaintiff testified the budget cuts were worse each year from 2010 to 2012.  She thinks she had to take furlough days in 2010 due to the budget crisis.

The Plaintiff testified she was aware of "talk" that DHS was considering closing ISD and ISVI.  She stated that when budgets were discussed, the schools were always first on the "chopping block."  Moreover, it was always difficult to hire and fill positions throughout the Plaintiff's tenure as Superintendent and Dual Superintendent.  The Plaintiff had no say in how much the people she supervised were paid.  That decision was made by the Governor's Office of Management and Budget.

### D. Facts relating to Robert Kilbury

Defendant Robert Kilbury was the Director of Division of Rehabilitative Services, a division of DHS, from 2004 to 2011.  Kilbury was the Plaintiff's supervisor from 2006 to 2010.  Kilbury testified he had no

role in setting salaries for new hires of senior public service administrator positions.  The Plaintiff disputes this and alleges Kilbury was involved in setting her salary.  Kilbury did not have authority to create new positions within the Division of Rehabilitative Services.  He went on disability leave around the time the Plaintiff was hired for the dual superintendent position.  The Plaintiff believes Kilbury was still personally involved in the decision regarding pay.

### E. Facts relating to Francisco Alvarado

At all relevant times to this suit, Francisco Alvarado was the Assistant Director of the Department of Rehabilitative Services at DHS. Alvarado testified he did not have any authority to set her salary.   During negotiations, he was following the directions of his supervisors.  Alvarado testified that although he made the $106,000 offer to the Plaintiff on his own, it was subject to the approval of Kilbury if the Plaintiff had accepted the offer.

### F. Facts relating to Michelle Saddler

Michelle Saddler was the Secretary of DHS from 2010 to 2015,

except for a brief period in late 2010 when she returned to the Governor's Office.  The Plaintiff testified she did not believe that Saddler made the decision as to how much the Plaintiff would be offered for the dual superintendent position.  However, the Plaintiff maintains that Saddler was personally involved.  Saddler could have done something about the salary and did nothing.

G. Facts relating to Governor Quinn

Patrick J. Quinn, III, was the Governor of Illinois at all times relevant to this case.  The Plaintiff alleges the only person who talked to her specifically about Governor Quinn making any comment about her salary was Alvarado.  Alvarado testified he has never spoken to Governor Quinn and did not speak to Governor Quinn about the Plaintiff.

The Plaintiff testified that although she had met Governor Quinn previously and he might even recognize her, she did not believe the Governor had any reason to know how much she was making.  However, she stated that Alvarado told her he did.  The Plaintiff testified she believed Governor Quinn discriminated against her by not approving her salary

request due to her gender.

The Plaintiff did not talk to Governor Quinn at any time relevant to this lawsuit, except in passing when shaking hands with the Governor. The Plaintiff testified she had not known the Governor to make decisions regarding ISD and ISVI in the past. She stated that she did recall him making such decisions as Lieutenant Governor.

The Plaintiff had not known the Governor to personally make any specific salary decisions about her immediate supervisors. Defendant Saddler did not recall personally having a conversation with Governor Quinn about the Plaintiff's salary.

Count I is an EPA claim directed against DHS. Count II is asserted pursuant to § 1983, wherein the Plaintiff alleges her rights under the Equal Protection Clause were violated by Saddler, Kilbury, Alvarado and Quinn. Count III is a Title VII claim against DHS.

The Defendants have moved for summary judgment on all claims.

## II. LEGAL DISCUSSION

A. Legal standard

12

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. See id.

### B. Equal Pay Act claim

The EPA prohibits gender discrimination based on wages by prohibiting certain employers from paying women less than men for "equal work on jobs the performance of which requires equal skill, effort, and

responsibility, and which are performed under similar working conditions."
29 U.S.C. § 206(d )(1).  If the employee meets her burden, the employer
may show that the pay difference is "pursuant to (i) a seniority system; (ii)
a merit system; (iii) a system which measures earnings by quantity or
quality of production; or (iv) a differential based on any factor other than
sex."  Id.  The employer asserting one of these affirmative defenses has the
burdens of production and persuasion.  See King v. Acosta Sales and
Marketing, Inc., 678 F.3d 470, 474 (7th Cir. 2012).

The Defendants claim they are entitled to summary judgment on the
Plaintiff's EPA claims because two affirmative defenses apply.   The
Defendant alleges the Plaintiff's salary was set according to a bona fide
merit compensation system.  Moreover, the Plaintiff's salary was set during
a time of significant budgetary strain for DHS and the State, which
constitutes a factor other than sex.

As the Defendants allege, it is not the Court's role to determine an
appropriate standard for what is an "acceptable" business practice.  See
Wernsing v. Dept. of Human Services, 427 F.3d 466, 468 (7th Cir. 2005).

"The statute asks whether the employer has a reason other than sex–not whether it has a "good" reason."  Id.

The Defendants contend that the differences in pay between the Plaintiff and Reggie Clinton are based on the existence of a bona fide merit compensation system that is governed by the Illinois Personnel Code, 20 ILCS 415/1 et seq., the Illinois Department of Central Management Services' Pay Plan, 80 Ill. Admin Code §§ 301-305, 320 et seq., and the CMS transactions manual.

The plaintiff in Wernsing started working at the Department of Human Services, where she received a 30% raise from her most recent position, though her salary was significantly less than others who did the same work.  427 F.3d at 467.  Although her male comparator received only a 10% raise from his most recent salary, he made more than $12,000 more per year than the Plaintiff.  See id.  The court observed, "People who came to the Department from more remunerative positions landed higher salaries (though lower percentage raises)."  See id.

The Defendants claim the same is true in this case.  The court in

Wernsing stated that although the individuals do the same work, their salaries are "substantially different" due to the process for determining initial salaries.  See id.  The Seventh Circuit noted that it had previously recognized that prior wages are a "factor other than sex" for purposes of the EPA and the court found no basis to revisit those decisions.  427 F.3d at 468.

The Defendants allege that as superintendent of ISVI in 2002 and 2003, Reggie Clinton received a salary of $93,336 at the time of his departure.  As superintendent of Arcola District Schools, Clinton earned an annual salary of $118,794.  Clinton returned as superintendent of ISVI and remained in that position until 2010.  The Defendants assert that Clinton received an increase of 1.9% from his most recent salary at Arcola, for a total annual salary of $121,116.

The Plaintiff acknowledged that when she received a salary increase, her previous salary was taken into account.  The Plaintiff also recognized that Clinton's salary in excess of $121,000 was because he had a high salary at Arcola and that "pay code" was used to give him a raise.

The record establishes that although DHS personnel such as Sherrie Bridges and Francisco Alvarado may have worked to set up the position with CMS, it was pursuant to its Pay Plan that CMS sets a specific salary range for a particular position and DHS officials have no input on that range.  As in Wernsing, Clinton's salary upon returning to DHS was governed by his prior salary.  Similarly, the offer to the Plaintiff was based on her salary at the time.

It is undisputed that Plaintiff's superiors took additional steps, including seeking special permission from CMS, to give the Plaintiff an increase of 21%.  Michelle Saddler could not recall any other employee during her tenure at DHS receiving as high an increase of 21% over a previous salary.  As the Plaintiff alleges, however, it was also unheard of for an employee to assume all of the duties of the superintendent of one of the residential schools and remain the superintendent of the other one. However, if no other employee performed all of those duties, then no one received a higher salary for performing the same job.

The Plaintiff's salary as dual superintendent was also greater than her

17

two immediate male supervisors.  This is certainly a significant factor when considering whether the decision regarding the Plaintiff's salary was based on gender-neutral reasons.

The Plaintiff contends she could have been paid more than Reggie Clinton and the merit compensation system would not have restricted her from receiving a $126,000 salary.  The Plaintiff herself acknowledged that an increase in salary of more than 5% required special circumstances.  Still she was offered an unprecedented 21% increase, while Clinton received a 1.9% increase in salary upon returning to DHS in 2008.

Prior to taking the dual superintendent position, the Plaintiff's salary was nearly $40,000 lower than Clinton's salary before be became superintendent of ISVI.  Although the Plaintiff compares her yearly evaluations and work performance to that of Clinton, those are not significant considerations under the CMS Pay Plan.  The CMS Pay Plan is based on prior salaries.  The Plaintiff's preferred approach may or may not be a better way to determine salaries but that is not for the Court to decide.  See Wernsing, 427 F.3d at 468 (noting that the injury is whether the

employer's reason is something other than sex–not whether it has a "good" reason and "Congress has not authorized federal judges to serve as personnel managers for America's employers.").

As was the case in Wernsing, the Court concludes the record demonstrates that the Plaintiff's salary is based on the application of the CMS Pay Plan, which constitutes a legitimate "factor other than sex" under the EPA.  Accordingly, the Plaintiff's EPA claim against DHS is barred by a merit system which serves as an affirmative defense.

Another affirmative defense that also appears to apply is that budget concerns were an ever present factor at the time of the salary decision. "[T]he EPA's fourth affirmative defense is a broad catch-all exception that embraces an almost limitless number of factors, as long as they do not involve sex."  Dey v. Colt Const. & Development Co., 28 F.3d 1446, 1462 (7th Cir. 1994) (internal quotation marks and citations omitted).  The factor need not be business-related but it must be bona fide and not discriminatorily applied nor may it have a discriminatory effect.  See id.

There is no dispute that the State of Illinois was experiencing budget

concerns at the time the Plaintiff's salary was being considered. The Plaintiff was aware of the budget crisis and acknowledged that she had difficulty hiring and filling positions because of budget concerns. The Plaintiff alleges that despite problems with the budget, DHS did not have a legal justification to pay her less than her male comparator. Moreover, the State could have saved $88,000 by paying her to do two jobs what they paid Reggie Clinton to do one. This demonstrates a misunderstanding of (or disagreement with) the CMS Pay Plan

The record demonstrates that budget concerns were a bona fide factor. Defendants Alvarado and Saddler believed that 6% across the board cuts were a realistic possibility. Although the Plaintiff alleges she could have been paid a salary similar to Clinton, his salary was set pursuant to the Pay Plan.

The "catch-all" affirmative defense is another reason why the Defendants are entitled to summary judgment on the Plaintiff's EPA claim against DHS. Because two affirmative defenses apply, the Court concludes that DHS is entitled to summary judgment on Count I.

## C. Section 1983 equal protection and Title VII claims

Based on the alleged sex discrimination regarding wages, the Plaintiff has also asserted a Title VII claim against DHS and § 1983 claims against the individual Defendants.  The Title VII and § 1983 claims are analyzed under the same general framework.  The inquiry concerns whether the evidence would permit a reasonable factfinder to conclude that the Plaintiff's sex caused the salary disparity.  See Ortiz v. Werner Enterprises, Inc., __ F.3d __, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016).  All evidence, whether direct or indirect, "belongs in a single pile and must be evaluated as a whole."  See id. at *5.

### (1)

The Court concludes that Plaintiff's individual claim against Governor Quinn under § 1983 fails because the Plaintiff has not shown that Governor Quinn had any involvement in the decision.  "Because § 1983 does not allow actions against individuals merely for their supervisory role of others, individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue."  Palmer v.

Marion County, 327 F.3d 588, 594 (7th Cir. 2003) (internal quotation
marks and citations omitted).

The Plaintiff argues that Governor Quinn was personally involved in
the decision and states that Defendant Alvarado told her the Governor
would not approve her salary request.   However, even the testimony
referenced by the Plaintiff is somewhat equivocal as to whether Alvarado
was referring to the Governor or the Governor's Office.   The Plaintiff
testified:

> [Alvarado] was offering I think 100 and then I countered
> with 115.  He took that back and they said, he called me back
> and said that, no, you can't have 115.  The Governor's Office
> – the Governor says you can only have 101 or something like
> that, plus bilingual, so it would be 106.

See Doc. No. 58-1, at P. 57.  Based on that passage, it is not entirely clear
whether the Plaintiff is referring to the Governor or the Governor's Office.
Regardless, it is a hearsay statement and Alvarado stated that he has never
spoken to Governor Quinn and he did not speak to Governor Quinn about
the Plaintiff's request or salary demands.  The Plaintiff also testified she did
not believe the Governor would have any role in such matters.  Because

22

there is no competent evidence that Governor Quinn had any personal involvement in the Plaintiff's salary decision, the Court concludes that Governor Quinn is entitled to summary judgment on the § 1983 claims.

(2)

Even assuming the other individual Defendants–Kilbury, Alvarado and Saddler–were personally involved in the decision, there is no evidence any of those individuals determined that Plaintiff could not be offered a higher salary because she was a woman. Given that Saddler received approval from the Governor's Office and the Governor's Office of Management and Budget to offer the Plaintiff a salary of more than 5% above her most recent salary and because Saddler sought guidance from Jerome Stermer, Toni Irving and David Vaught after the Plaintiff's counteroffer of $112,350, it would appear those individuals had the final say and were personally involved in the decision not to go above a certain amount. It was Irving who stated that they should start interviewing replacements. Accordingly, the record establishes that the individual Defendants had no role in setting the Plaintiff's salary.

There is no evidence in the record that any individual disparaged the Defendant or suggested that she could not be offered a higher salary because she is a woman.  The Plaintiff has not pointed to any suspicious timing which might suggest the decision was based on gender.  She has not pointed to any other female employees of DHS who were the subject of discrimination due to her gender.

The Plaintiff's speculation as to the motives of the individual Defendants is not enough to create a factual dispute.  See Harper, 687 F.3d at 306.

Additionally, the Plaintiff has not pointed to any male candidate for the dual superintendent position who had the same or similar previous salary and who was offered a higher salary for the position than she.  There is no evidence that a similarly situated male employee was treated more favorably.  Because of their different salaries at the time of the employment decision, Reggie Clinton and the Plaintiff were not similarly situated.

The Defendants negotiated with the Plaintiff and obtained consent to offer her more than the standard 5% increase.  They relayed the

Plaintiff's salary requests to the appropriate officials in the Governor's Office and the Governor's Office of Management and Budget.

Upon considering all of the evidence, the Court concludes no reasonable factfinder could find that the individual Defendants discriminated against the Plaintiff because of her sex. Accordingly, they are entitled to summary judgment on the Plaintiff's § 1983 claims.[1]

(3)

For many of the same reasons, DHS is entitled to summary judgment on the Title VII claims. Based on the constraints of the pay plan, the record establishes that Plaintiff was treated more favorably than most candidates would likely have been. The Plaintiff was paid more than her supervisor. The record establishes that she received a higher percentage salary increase than any male candidate for a superintendent position. Significantly, there is a reasonable explanation for Reggie Clinton's higher

---

[1]Defendants Saddler, Kilbury and Alvarado would also be entitled to qualified immunity on the individual capacity claims. Although she has generally alleged the violation of a constitutional right, the Plaintiff cannot show that any individual engaged in specific conduct that violated her constitutional rights to such an extent that a reasonable person would have known it to be a violation.

salary as ISVI superintendent–that being his prior salary at Arcola and the 1.9% raise he received upon returning in 2008.

Upon considering all of the evidence and construing all inferences in a light most favorable to the Plaintiff, the Court concludes that no reasonable factfinder would determine that DHS discriminated against the Plaintiff on the basis of sex.   Accordingly, DHS is entitled to summary judgment on the Title VII claims.

<u>Ergo</u>, the Defendants' Motion for Summary Judgment [d/e 57] is ALLOWED.

The Clerk will enter Judgment in favor of the Defendants and against the Plaintiff.

Upon entry of Judgment, the case shall be terminated.

ENTER: September 28, 2016

FOR THE COURT:

 /s/ Richard Mills
Richard Mills
United States District Judge

26